UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | 1:20-CR-00298 |
| | : | |
| v. | : | JUDGE WILSON |
| | : | |
| DANIEL GUTMAN and | : | (FILED ELECTRONICALLY) |
| BENJAMIN GUTMAN | : | |

## BRIEF OF UNITED STATES IN OPPOSITION TO DEFENDANTS' MOTION FOR RECONSIDERATION

As the defendants concede, under Federal Rule of Criminal Procedure 37(a), the Court may not grant the defendants' motion for reconsideration. For the reasons explained herein, the Government respectfully requests that the Court deny the motion and make clear that actual harm occurred, that no manifest injustice has occurred, and that the same sentence—30 months of imprisonment—would be imposed under the Section 3553(a) sentencing factors, notwithstanding *Banks* or any subsequent decision affecting the applicability of the Section 2B1.1 application notes. *See United States v. Banks*, 55 F.4th 246 (3d Cir. 2022).

Pursuant to Federal Rules of Criminal Procedure 35(a) and 37(a), the Court must deny the motion for several reasons. First, there was no clear error, and therefore no sentence correction is either needed or

1

appropriate. The defendants' sentences are not affected by *Banks*, which did not reach the Guidelines Application Note upon which the Court's sentence relied. Furthermore, the Third Circuit's decision in *Banks* was factually premised on a condition not present here—namely, that it was beyond dispute in *Banks* that the lone intended victim suffered no actual harm. Here, by contrast, there are several victims that suffered actual pecuniary harm. When victims have suffered harm but the measurement of that harm presents practical challenges, a court may, as it did here, turn to Application Note 3(F)(v) for appropriate guidance, as it provides a reasonable construction of the ambiguous term "loss." Finally, even assuming for the sake of argument that the actual loss amount is zero and that the special rules in Application Note 3(F) do not apply, the defendants' sentences are still within a correctly calculated Guidelines sentencing range, as explained below. For these reasons, the Court should (1) deny the defendants' motion and, to ensure finality and deter the further pursuit of a frivolous appeal, clearly state that (2) victims sustained actual harm, (3) no manifest injustice has occurred, and (4) identical sentences would be imposed even if resentencing were to occur.

I.   *Banks* Does Not Affect The Defendants' Sentences

The Third Circuit's ruling in *United States v. Banks* was limited to a construction of Application Note 3(A) and, even more specifically, whether its definition of loss as the greater of actual loss or intended loss was an impermissible expansion of the term "loss" in U.S.S.G. § 2B1.1(b)(1). The Third Circuit could have, but did not, reach the conclusion that other Guidelines commentary under Application Note 3 was invalid under *Nasir* and its progeny. *United States v. Nasir*, 17 F.4th 459, 468 (3d Cir. 2021) (en banc). Indeed, it did not even suggest that it considered Application Note 3(F) problematic.

This Court need not consider the sweeping conclusion advocated by the defendants when the Third Circuit did not even hint that its intent was to invalidate further Guidelines commentary. Before *Banks*, the Third Circuit had at least gestured at its concerns about the intended loss provision. *Banks*, 55 F.4th 246, 256 n.47 ("Although we have suggested that "[b]y interpreting 'loss' to mean intended loss, it is possible that the commentary 'sweeps more broadly than the plain text of the Guideline,'" we have not resolved the issue.") (citing *United States v. Kirschner*, 995

F.3d 327, 333 (3d Cir. 2021)). By contrast, the Third Circuit has raised no questions about the vitality of Application Note 3(F) post-*Nasir*, and neither has any other court. Accordingly, there is no basis for the defendants' motion for reconsideration.[1]

## II.   This Case Involves Actual, Pecuniary Harm—*Banks* Did Not

As the Court previously summarized, "In a nutshell, Defendants used a fraudulent scheme to avoid necessary Government oversight through the United States Department of Agriculture, and Defendants provided cattle to their customers that were not the cattle bargained for. Defendants falsely represented to the Government and their customers that the cattle were correctly tested for bovine diseases when they were not." Doc. 116 at 2. This fact is sufficient to show that the defrauded buyers

---

[1] Defendants cite the recent decision in *United States v. McKinney*. ___ F. Supp. 3d ___ , 2022 WL 17547467 (E.D. Mich. 2022). Like *Banks*, this case was simply about whether intended loss could serve as the basis for an offense-level enhancement. That district court ruled that it could not, but it said nothing about Application Note 3(F). Even more importantly, in *McKinney*, the court appeared to acknowledge that some cases "involv[ing] a dispute about how to calculate loss amount under § 2B1.1(b)" may require looking to the further commentary under that Guidelines section. *See McKinney*. ___ F. Supp. 3d ___ , 2022 WL 17547467, at *9 (citing *United States v. Nagle*, 803 F.3d 167, 179 (3d Cir. 2015); *United States v. Crowe*, 735 F.3d 1229, 1237 (10th Cir. 2013); *United States v. Dowl*, 619 F.3d 494, 502 (5th Cir. 2010)).

of defendants' cattle suffered actual harm, making this case vastly different from *Banks*.

*Banks* was about whether an intended loss amount may be used to the increase the offense level even when there is no question that the actual loss amount is zero. As the Third Circuit explained, "the District Court erred when it applied the loss enhancement because Banks's crimes caused *no actual loss*." *Banks*, 55 F.4th 246, 250 (emphasis added). Indeed, the fact that the sole intended "victim suffered $0 in actual losses" was not in debate, and this factual premise was critical to the Third Circuit's decision. *Id.* at 255. As the Third Circuit explained . . .

> Banks's scheme targeted Gain Capital Group, which did business as Forex.com. Gain Capital's clients opened accounts, deposited funds, and then used those funds to invest in the foreign currency exchange market. Banks's plot was to open Gain Capital accounts and make electronic deposits into those accounts, but his deposits were drawn on bank accounts with insufficient funds. He then tried to withdraw funds from these accounts, "with the goal being to complete the withdrawals/transfers before the lack of supporting funds could be detected." . . .
>
> Importantly, Gain Capital suffered *no actual loss*. Banks made fraudulent deposits of $324,000 and unsuccessfully executed 70 withdrawals/transfers totaling $264,000. *Gain Capital, however, did not transfer a single dollar to Banks.*

*Id.* at 251 (emphasis added). Here, by contrast, the main victim, Baladna,

paid more than $9 million for cattle that the defendants sold to it through fraudulent means, including nearly $7.5 million directly paid to the defendants, Daniel and Benjamin Gutman. Baladna bargained with the defendants for properly identified, documented, and diseased-tested cattle, and what it got were cattle that satisfied none of these criteria. Daniel and Benjamin Gutman lied to Baladna and sold it cattle in flagrant violation of U.S. export control laws, causing the company actual harm.

In calculating the applicable advisory Guidelines range for the defendants, the Court relied exclusively on the harm suffered by Baladna; however, as the Court noted in its recent order, the harm to Baladna was but one instance of actual, pecuniary harm sustained by victims. The Court's reliance on Application Note 3(F)(v) was premised on the Sentencing Commission's reasonable construction of the ambiguous term "loss," which encompasses "the loss of competitive advantage for others who comply with regulations and the corresponding unwarranted gain to the defendants; the harm to consumers who received products that were not as represented; and the loss of confidence in the regulatory process." Doc. 116 at 6. The actual, pecuniary harm to Baladna falls into the second

category—harm to consumers—but there is no question that victims in the other categories likewise sustained actual harm.

The government previously addressed the harm to the defendants' competitors at great length. *See* Doc. 89 at 101–104; 148–151. Without repeating all of those points, it suffices to say, as the Court acknowledged, that competitors were harmed in a real, pecuniary sense by the defendants' criminal conduct, including through the loss of legitimate, non-fraudulent sales. In a case like this one, where victims suffer actual, pecuniary harm but coming up with a reasonable estimate of that harm presents challenges, it is justified to look to Application Note 3(F), as this Court did when calculating the defendants' advisory Guidelines range.

## III. <u>The Construction Of "Loss" In Application Note 3(F)(v) Reflects The Term's Ordinary Meaning</u>

In *Banks*, the Third Circuit conducted a review of common dictionary definitions of "loss," which it found pointed to an ordinary meaning of the word. This ordinary meaning is consistent with "loss" as that term is utilized in Rule 3(F)(v). *See* U.S.S.G. § 2B1.1, note 3(F)(v) (In certain special circumstances, "loss shall include the amount paid for the property, services or goods transferred, rendered, or misrepresented, with

no credit provided for the value of those items or services").

This Court agreed with the official position of the Sentencing Commission: when goods are sold only after obtaining regulatory approval by fraud, those goods must be attributed no value. This position reflects the ordinary understanding of loss as the "detriment or disadvantage involved in being deprived of something[.]" 9 *Oxford English Dictionary* 37 (2d ed. 1989); *see Banks*, 55 F.4th 246, 258 (quoting same). Daniel and Benjamin Gutman lied directly and repeatedly to Baladna—*not* just the USDA. Baladna bargained for disease-tested cattle, but what it got were illegal goods with no value in international commerce. Had Baladna known that it was getting untested cattle, Baladna would not have simply paid less. It would not have paid a cent. Baladna was thus entirely deprived of the fair benefit of its bargain.

There were also actual, pecuniary losses sustained by other members of the cattle export industry. The defendants' competitors were deprived of the financial benefit that they should have enjoyed as law-abiding members of the industry. This notion of loss reflects the ordinary meaning of "the damage, trouble, disadvantage, [or] deprivation . . . caused by losing

something" or "the person, thing, or amount lost." *Webster's New World College Dictionary* 799 (3d ed. 1996); *see Banks*, 55 F.4th 246, 258 (quoting same).

These examples again illustrate a key difference between the victims in this case and the lone victim in *Banks.* There, intended loss impermissibly expanded the notion of loss because it took a party that was not "deprived" of a cent and attributed to it a loss of $324,000. Here, the construction of loss under Application Note 3(F)(v) is not only consistent with an ordinary meaning of the term, but it also helps to provide clarity to courts when encountering practical challenges associated with an actual loss determination under Application Note 3(A). In this regard, Application Note 3(F)(v) functions in a manner similar to Application Note 3, sections (C) through (E). Those provisions provide methodological clarity, including what expenses to include and what expenses not to include when calculating loss. They do not conjure loss where none exists.

As previously discussed, the Sentencing Commission adopted this Application Note as its official position in response to courts erroneously concluding that parties that bargained for goods and services with certain

specifications, consistent with regulatory requirements, were not harmed even when they received goods and services that did not meet those requirements. The logic of the Sentencing Commission's official position has been fleshed out in numerous cases in recent years, many of which were discussed at length in an earlier government brief. *See* Doc. 89 at 71–79 (citing *United States v. Canova*, 412 F.3d 331, 352 (2nd Cir. 2005) ("When a party fraudulently procures payment for goods or services by representing that they were produced or provided according to certain specifications, it is not the task of a sentencing court to second-guess the victim's judgment as to the necessity of those specifications. Whether the testing time on a pacemaker, the number of rivets on an airplane wing, or the coats of paint on refurbished building is a matter of necessity or whim, the fact remains that the victim has been induced to pay for something that it wanted and was promised but did not get, thereby incurring some measure of pecuniary harm."); *United States v. Gonzalez-Alvarez*, 277 F.3d 73, 78, 80 (1st Cir. 2002) ("[C]onsumers here who reasonably believed they were purchasing milk compliant with all government health regulations, but in fact received a different product of unknown safety,

10

were denied the benefit of their bargain and suffered an actual loss. . . .
Where a product has a value of zero as a matter of law, but consumers pay
for the product as if it had value, the buyers have been robbed of the
benefit of their bargain. . . . Where the milk does not meet these standards,
as a result of a defendant's conduct, the consumers suffer an actual loss
and the defendant is responsible for that loss.)).

IV. **The Defendants' Sentences Fall Within The Advisory Guidelines
Range Even Assuming Zero Actual Loss**

It is unclear how defendants arrive at the conclusion that their
advisory Guidelines range would have been 8 to 14 months absent the use
of Application Note 3(F)(v). This claim is simply incorrect. Even if the
Court concluded that the loss amount was zero, the advisory Guidelines
range for each defendant would still be no less than 18 to 24 months.
Furthermore, there are additional enhancements that can and should
apply even in the absence of an upward variance or departure, such as the
enhancement for obstruction of justice under U.S.S.G. § 3C1.1.[2] If this

_____

[2] As the government previously noted when addressing defendants' PSR
objections, "the defendants' prior conduct would call for enhancements for
both (1) obstruction under U.S.S.G. § 3C1.1 and (2) violation of a prior
order, injunction, decree, or process not addressed elsewhere in the
guidelines under U.S.S.G. § 2B1.1(b)(9)(C). Each of these enhancements

matter ended up before the District Court for resentencing, the government would ask for an enhancement for obstruction of justice to be added part of the Chapter Three adjustments, likely resulting in an advisory Guidelines range of 24 to 30 months. This enhancement would be fully justified by the defendants' years of repeated lies to regulatory authorities when questioned about their lack of adherence to identification, documentation, and disease-testing requirements. *See* Doc. 89 at 108–09, 113–114.

"The [United States Sentencing] Guidelines provide explicit and unambiguous application instructions: First, find the appropriate offense conduct guideline in Chapter Two; second, apply any appropriate specific offense characteristics contained in the offense conduct guideline in Chapter Two; third, apply any appropriate adjustments from Chapter

---

would normally account for two additional offense levels." Doc. 89 at 121. As the Court is aware, the government did not "advocat[e] for these additional enhancements, which were not previously identified to the Probation Office, to be added at [that] time." *Id.* Recognizing that the advisory Guidelines range would likely end up far in excess of the statutory maximum of 60 months, the government exercised its discretion not to push for every enhancement that should have applied. The situation would be very different if this matter ended up before the District Court for resentencing and Application Note 3(F) was no longer an available option.

Three[.]" *United States v. Clark*, 11 F.4th 491, 494 (6th Cir. 2021) (explaining the correct procedure for calculating the Guidelines under U.S.S.G. § 1B1.1(a)(1)-(4)). Following this order of operations, the defendants' advisory Guidelines ranges are calculated as follows, even assuming a loss amount of zero:

*Chapter Two: Offense Conduct*

Base offense level = 6 (§2B1.1(a)(2) applies due to a conviction under 18 U.S.C. § 371)

Sophisticated means = +2 or no less than 12 (§2B1.1(b)(10)(C))

Conscious risk of death or serious bodily injury = +2 or no less than 14 (§2B1.1(b)(16))

Total Offense Level from Chapter Two = 14

*Chapter Three: Adjustments*

Leadership role = +4

Credit for acceptance of responsibility = -3[3]

---

[3] The government agreed, albeit with some misgivings, to recommend credit for acceptance of responsibility notwithstanding that on the eve of sentencing the defendants were caught in text messages making innuendo about the murder of federal law enforcement agents and calling them "bastards." If this case ended up back before the District Court for resentencing, the government would take a fresh look at whether acceptance of responsibility credit was still warranted based on a totality of the circumstances, including whether defendants opted to pursue an appeal in violation of their plea agreements.

<u>TOTAL ADJUSTED OFFENSE LEVEL = 15 (18 MONTHS TO 24 MONTHS)</u>

With the addition of two points for obstruction, the total adjusted offense level would be 17, resulting in an advisory Guidelines range of 24 to 30 months. In other words, even assuming a loss of zero, the already imposed sentences of 30 months would be within the advisory Guidelines range. Based on the foregoing, there is no error in need of correction, let alone a "clear error" under Federal Rule of Criminal Procedure 35(a).

## V.   <u>An Incorrect Advisory Guidelines Calculation Would Not Constitute Manifest Injustice</u>

The defendants repeatedly characterize their motion as one that is intended to prevent "manifest injustice." This argument is flatly inconsistent with clear Third Circuit precedent, which holds that there is no manifest injustice even when there is a miscalculation of the advisory Guidelines by a sentencing court. Troublingly, the defendants' argument appears intended to induce the Court to make a conclusion that would have the effect of nullifying the appellate waiver in the defendants' plea agreements. The Court should clearly reject this effort to blow the case open to years of additional appeals and litigation.

As explained above, even if the loss amount were zero, and even if

14

no additional (albeit justified) enhancements were applied, the defendants' sentences exceeded the advisory Guidelines range by only six months—amounting to an alleged error of two points in the calculation of the offense level. This is simply not a manifest injustice.

"Courts apply the miscarriage of justice exception sparingly and without undue generosity, but with the aim of avoiding manifest injustice." *United States v. Castro*, 704 F.3d 125, 136 (3d Cir. 2008) (internal citations omitted). A manifest injustice or miscarriage of justice depends on factors such as "the clarity of the error, its gravity, its character (e.g., whether it concerns a fact issue, a sentencing guideline, or a statutory maximum), the impact of the error on the defendant, the impact of correcting the error on the government, and the extent to which the defendant acquiesced in the result." *United States v. Khattak*, 273 F.3d 557, 563 (3d Cir. 2001).

Even assuming for the sake of argument that the correct range should have been 18 to 24 months, prior decisions of the Third Circuit make it clear that a sentence of 30 months was not manifestly unjust. "[A] district court's arguably erroneous calculation of a guidelines range is

precisely the kind of garden variety claim of error contemplated by an appellate waiver. It is not a miscarriage of justice." *Castro*, 704 F.3d 125, 141–42 (internal citations omitted).

In *Erwin*, the defendant contended his Guidelines range should have been based on an offense level of 33, rather than 34. Due to the alleged error, his Guidelines range was 151 to 188 months rather than 135 to 168 months. As a result, he believed that his sentence of 188 constituted a miscarriage of justice. The Third Circuit disagreed, it held that Erwin was in breach of his plea agreement for bringing an appeal on this basis, and it remanded for resentencing knowing that the government would be seeking "a 'modest increase' in Erwin's sentence in light of his breach of the appellate waiver." *See United States v. Erwin*, 765 F.3d 219, 225 (3d Cir. 2014). *Erwin* makes clear that this case, with a perceived error amounting to an additional six months of imprisonment above the advisory Guidelines range, does not give rise to a miscarriage of justice.

The defendants' plea agreements each state that pursuing either a direct or collateral appeal may constitute a breach of the agreement. *See* Doc. 37, ¶ 37; Doc. 39, ¶ 37. There is a possible exception, however, for

16

pursuing an appeal due to what would otherwise constitute a "miscarriage of justice." *Id.* This seems to be why defendants have styled their request as one aiming to prevent manifest injustice. Even though Rule 35(a) says nothing about "manifest injustice" or a "miscarriage of justice," the defendants are well aware of the practical import of that language.

The defendants have repeatedly demonstrated their desire to have their cake and eat it too. They want to hold on to their plea agreements—which limit their prison sentences to 60 months, require the dismissal of additional charges of which they are guilty (such as wire fraud, with a statutory maximum of 240 months), give them credit for acceptance of responsibility, limit their financial penalties, and limit the government from bringing further prosecution against them—while doing everything in their power to chip away at the consequences of their convictions. This was the very same reason that they brought a frivolous motion for sanctions—seeking to have suppressed some of the most devastating evidence against them—while, curiously, not asking to withdraw their guilty pleas. Their design is evident: to ensure they get all of the upside of pleading guilty while trying to eliminate as much of the downside as

possible. If the Court needs any further evidence of the defendants'
motives, it need look no further than their recent brief, in which they again
revert to their arguments that their crime was a mere false statements
offense, not a fraud scheme, and that no one sustained any harm.

For this reason, it is critical for the Court to state in its forthcoming
ruling that there was no manifest injustice or miscarriage of justice
associated with the calculation of the defendants' advisory Guidelines
range or the imposition of their sentences. Such a conclusion will
discourage the further pursuit of a frivolous appeal that is designed to
prolong this case and deny the government the benefit of its bargain.
*United States v. Bernard*, 373 F.3d 339, 345 (3d Cir. 2004) (contract law
prohibits a defendant from "get[ting] the benefits of [his] plea bargain,
while evading the costs").

## VI.  The Court Should Clarify The Appropriateness Of A 30-Month Sentence Under The Section 3553(a) Factors

In this case, the Court arrived through a deliberate decision-making
process at a sentence of 30 months for each defendant. To be clear, each
defendant has already benefited from a massive downward variance from
the advisory Guidelines range. As the previous section makes clear, the

18

effect of that variance was, in practical terms, to reduce defendants to an offense level associated with a loss of almost zero, even though the actual, pecuniary harm to victims was real and significant.[4]

The Court granted these variances despite the defendants' years of illegal profit-seeking and their complete disregard of any effort by federal and state regulators to get them to comply with disease-testing, identification, and documentation requirements for dairy cattle moved in interstate and international commerce. The Court also granted these variances despite the history and characteristics of the defendants, demonstrated, among other ways, by their predatory approach to accredited veterinarians, their crude jokes about the deaths of dairy cattle they sold to Baladna, their use of racist epithets in recorded conversations, and their shocking text messages about wanting federal agents to be shot.

Under Rule 37(a), the Court has the clear authority to deny the defendants' motion for reconsideration. The Court should not only deny the motion, but it should also state that it would again impose a 30-month

---

[4] In *Banks*, by contrast, the effect of the application of the intended loss amount was to increase Banks' offense level from 7 to 19. The district court did not even stop there. It varied upward to impose a sentence of 104 months, *tripling* the advisory Guidelines range of 30 to 37 months.

sentence on each defendant if the matter were remanded for resentencing based on the Section 3553(a) factors. Such a ruling would promote finality of the defendants' sentences and bring a long overdue end to this case.

## VII. Conclusion

For the foregoing reasons, the government respectfully requests that the Court (1) deny the motion for reconsideration, (2) find that victims sustained actual harm even if precise measurement of that harm is not practical, (3) state unequivocally that no manifest injustice or miscarriage of justice has occurred and (4) state that it would impose identical sentences of 30 months under Section 3553(a) if the defendants were resentenced.

Respectfully submitted,

GERARD M. KARAM
UNITED STATES ATTORNEY

Dated: January 9, 2023          /s/ *Ravi R. Sharma*

RAVI ROMEL SHARMA
Assistant U.S. Attorney
ravi.sharma@usdoj.gov
Bar ID: PA 331135
228 Walnut Street, Suite 220
Harrisburg, PA 17101

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | 1:20-CR-00298 |
| | : | |
| v. | : | **JUDGE WILSON** |
| | : | |
| **DANIEL GUTMAN and** | : | (FILED ELECTRONICALLY) |
| **BENJAMIN GUTMAN** | : | |

## CERTIFICATE OF SERVICE

I certify that on January 9, 2023, I served the foregoing document by electronic service on the following individuals:

James M. Trusty, Esq. – jtrusty@ifrahlaw.com

A. Jeff Ifrah, Esq. – jeff@ifrahlaw.com

Stephen A. Miller, Esq. – samiller@cozen.com

/s/ Ravi Romel Sharma
Ravi Romel Sharma
Assistant U.S. Attorney